**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THERESA KRAYNACK-SIMON, | ) | CASE NO. 4:23-cv-00835-DAR |
| | ) | |
| Plaintiff, | ) | |
| | ) | U.S. DISTRICT JUDGE |
| | ) | DAVID A. RUIZ |
| v. | ) | |
| | ) | U.S. MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.      INTRODUCTION

Plaintiff Theresa Kraynack-Simon ("Ms. Kraynack-Simon") seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her application for Disability Insurance Benefits ("DIB"). (ECF No. 1.) U.S. District Judge David A. Ruiz has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. For the reasons set forth below, I RECOMMEND that the Court VACATE and REMAND the Commissioner's final decision.

## II.      PROCEDURAL HISTORY

Ms. Kraynack-Simon filed an application for DIB on October 29, 2020, alleging a disability onset date of March 29, 2020. (Tr. 239.) Ms. Kraynack-Simon's application related to high blood pressure, high cholesterol, generalized anxiety, Graves' disease, essential thrombocytosis, heart murmur, bipolar II disorder, depression, PTSD, and chronic anxiety. (Tr. 260.) Her application was denied initially and upon reconsideration. (Tr. 115-24.) Due to the COVID-19 pandemic, an administrative law judge ("ALJ") held a telephone hearing on August 9,

1

2022. (Tr. 44-80.) Ms. Kraynack-Simon, represented by counsel, and a vocational expert ("VE") testified at the hearing. (*Id.*) The ALJ issued a written decision on September 21, 2022, finding Ms. Kraynack-Simon was not disabled under the meaning of the Social Security Act. (Tr. 26-43.) The ALJ's decision became final on March 15, 2023, when the Appeals Council declined further review. (Tr. 1-7.)

On April 20, 2023, Ms. Kraynack-Simon filed her Complaint, challenging the Commissioner's final decision. (ECF No. 1.) Ms. Kraynack-Simon asserts the following assignments of error:

(1) The ALJ formulated an RFC without properly considering the effects of Plaintiff's mental impairments.

(2) The RFC determination is unsupported by substantial evidence because the ALJ improperly evaluated the opinion evidence.

(ECF No. 7, PageID#935.)

### III.    BACKGROUND INFORMATION[1]

#### A.  <u>Personal, Educational, and Vocational Experience</u>

Ms. Kraynack-Simon was born in 1961, and she was 58 years old on the alleged disability onset date. (Tr. 51, 239.) She lives alone, and she has a driver's license. (*Id.*) She earned an associate degree from the Art Institute of Pittsburgh, and she does not have any vocational training or licenses. (Tr. 52.) Ms. Kraynack-Simon's past relevant work was employment as an advertising manager. (Tr. 37; *see* Tr. 261.) Specifically, she previously worked for Greenwood Chevrolet as the director of marketing and advertising special events, and her duties included working at car shows, charity events, and any special events with entertainers on the property. (Tr. 53-54.)

---

[1] Because Ms. Kraynack-Simon's argument primarily deals with the ALJ's assessment of limitations related to her mental conditions, this summary will thus focus on the evidence related to those conditions.

### B.  Relevant Hearing Testimony

#### 1.  *Ms. Kraynack-Simon's Testimony*

Ms. Kraynack-Simon testified that she has been treated for mental health impairments for over 33 years. (Tr. 57.) She has been diagnosed with anxiety, depression, and PTSD. (*Id.*) Since March 2020, she has contemplated suicide on several occasions. (*Id.*) She takes prescribed medication and receives treatment from a psychologist and psychiatrist on a regular basis. (*Id.*) Ms. Kraynack-Simon's anxiety increased during the COVID-19 pandemic and "paralyzed [her] in fear" of dying from COVID-19. (*Id.*)

Ms. Kraynack-Simon described her typical day. She testified that she would wake up, cry, wonder if today was the day she was going to die, and then go back to sleep. (Tr. 58.) She naps for to six hours each day.  (Tr. 61.) If she is hungry, she will eat. (*Id.*) She stated that she cannot take care of her household, cannot do laundry, and no longer goes on walks. (*Id.*) She testified that she is unable to ascend and descend the stairs due to impairments in her hips and bone. (Tr. 59.) Her sisters or friends will do her laundry. (*Id.*) She is only able to walk about 10 minutes before needing to rest. (*Id.*) She can comfortably lift a gallon of milk. (*Id.*)

Ms. Kraynack-Simon experiences side effects from chemotherapy medications, including fatigue, hair loss, bone pain, and burning. (Tr. 55.) She also experiences black tarry stools, "burn[ing] from the inside out," night sweats and chills, fevers, low back pain, side pain, blood in her urine, bruising "from the smallest of touches on [her] skin," mouth sores, shortness of breath, and weakness and fatigue. (Tr. 60.)  She also gets confused easily and has memory loss. (*Id.*) She owned horses for over 35 years, but she had to give up her horse because she is no longer physically able to take care of the horse or ride it. (*Id.*) Ms. Kraynack-Simon stated that she no longer reads

because reading comprehension is very difficult. (Tr. 62-63.) She spends an hour or so online every day. (Tr. 63.) She no longer cooks. (Tr. 64.)

### 2. *Dr. Lewellyn's Testimony*

Ronald Lewellyn, Ph.D., Ms. Kraynack-Simon's psychologist, testified at the hearing. Dr. Lewellyn testified that he had treated Ms. Kraynack-Simon for over 20 years, and her condition has gotten worse. (Tr. 70.) Ms. Kraynack-Simon returned for treatment with Dr. Lewellyn after receiving a blood cancer diagnosis. (*Id.*) Dr. Lewellyn testified that, during that time, Ms. Kraynack-Simon struggled with fatigue, tiredness, "fuzzy-headedness," and difficulty tolerating her chemotherapy treatment. (*Id.*) Dr. Lewellyn stated that Ms. Kraynack-Simon's symptoms have "rapidly increased" since the COVID-19 pandemic, and her mental health functioning has deteriorated. (*Id.*) Specifically, Dr. Lewellyn noted that Ms. Kraynack-Simon experiences daily mood swings with depression and fearfulness about going out. (*Id.*) Dr. Lewellyn testified that Ms. Kraynack-Simon's main issues are her lack of focus and concentration. (Tr. 70-71.) Dr. Lewellyn stated that Ms. Kraynack-Simon is unable to track "small things" like watching a TV show, read for longer than 10 to 15 minutes, and complete household chores in a timely manner. (Tr. 71.) Dr. Lewellyn opined that Ms. Kraynack-Simon had declined to the point where "she is not present" and is unable to function at a work environment. (*Id.*)

### 3. *Vocational Expert's Testimony*

The VE testified that Ms. Kraynack-Simon had past relevant work as an advertising manager. (Tr. 73.) The ALJ first asked whether there would be any transferable skills from this job to work at the light or sedentary exertional level. (*Id.*) The VE stated that there were transferable skills for both exertional levels. (Tr. 74.) The ALJ first asked whether a hypothetical individual with Ms. Kraynack-Simon's age, education, and vocational experience could perform

her past relevant work at the medium exertional level, except that she can occasionally climb ramps and stairs, ladders, and ropes and scaffolds as actually or generally performed in the national economy.  (*Id.*)  The VE opined that the individual's past relevant work would be available with those limitations. (*Id.*)

The ALJ then asked whether the individual with the same limitations as the first hypothetical, except limited to the sedentary exertional level, could perform her past relevant work. (Tr. 76.) The VE opined that this individual could not perform her past relevant work. (*Id.*) The ALJ also asked whether there would be any skills that would transfer to other jobs that could be performed under the second hypothetical. (*Id.*) The VE opined that the individual could perform work as a public relations representative and fundraising director. (*Id.*) The skills that would be transferring from these jobs would be administering, advertising, and public relations. (Tr. 77.)

The ALJ next asked whether the VE's testimony would change if the individual from the second hypothetical were instead limited to never climbing ladders, ropes, and scaffolds, and needing to avoid exposure to dangerous moving machinery and unprotected heights. (Tr. 77-78.) The VE opined that these limitations would not change her testimony. (Tr. 78.) The ALJ then asked whether the VE's testimony would change if she also added that this individual should avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation. (*Id.*) The VE stated that this still would not change her testimony. (Tr. 78.)

The ALJ also asked whether the individual could still perform work if additionally limited to performing simple, routine tasks in a setting free of fast-paced production requirements and infrequent changes at employment tasks with occasional interaction with others. (Tr. 78.) The VE opined that there would be jobs available at the medium exertional level, but the individual would

not be able to do past work with the proposed mental limitations because there would be no transferable skills. (Tr. 78-79.)

The VE stated that employers would tolerate off-task behavior of up to 10 percent of the day and one to two absences in a month, but not on a consistent basis. (Tr. 79.) The VE opined that an employer would tolerate no more than five total absences. (Tr. 80.)

**C. Relevant Non-Medical/Medical Opinion Evidence**

**1. *Kenneth Gruenfeld, Psy.D.***

Dr. Gruenfeld conducted a psychological consultative examination of Ms. Kraynack-Simon on May 17, 2021. (Tr. 488-94.) Ms. Kraynack-Simon endorsed problems with depression, hypomania, and anxiety (Tr. 490, 492), but she presented with no abnormal medical signs on examination (Tr. 491-92). Specifically, Ms. Kraynack-Simon's appearance and behavior, conversation and speech, mood and affect, mental content, sensorium and cognition, and insight and judgment were normal. (*Id*.) Dr. Gruenfeld assessed Ms. Kraynack-Simon's functional abilities. Regarding Ms. Kraynack-Simon's ability to understand, remember, and carry out instructions, Dr. Gruenfeld opined that task comprehension will not be an issue. (Tr. 492.) Dr. Gruenfeld noted that Ms. Kraynack-Simon reported problems with focus and concentration due to her mental health issues, which impacted past job performance in her last years of employment. (*Id.*) As a result, Dr. Gruenfeld concluded that Ms. Kraynak-Simon "will have similar problems in the future and will struggle to consistently carry out future job tasks during periods of low motivation or high anxiety." (Tr. 493.)

Regarding Ms. Kraynak-Simon's abilities to maintain attention and concentration, to maintain persistence and pace, and to perform simple tasks and multi-step tasks, Dr. Gruenfeld opined that Ms. Kraynack-Simon would work more slowly than others "due to her issues of focus

and motivation and panic attacks." (*Id.*) Dr. Gruenfeld also assessed that Ms. Kraynack-Simon's panic attacks would cause problems with the completion of multi-step job tasks and a combination of tasks that require multi-tasking. (*Id.*) With respect to Ms. Kraynack-Simon's abilities to respond appropriately to supervision and to coworkers in a work setting, Dr. Gruenfeld opined that Ms. Kraynack-Simon would be able to effectively work with others but would struggle if her PTSD symptoms were triggered.  (*Id.*) Finally, regarding Ms. Kraynack-Simon's abilities to respond appropriately to work pressures in a work setting, Dr. Gruenfeld opined that stress would "trigger her mental health issues," and that the quality of consistency of future task performance would worsen as stress heightens. (*Id.*)

### 2.  *Ronald Lewellyn, Ph.D.*

On February 2, 2020, Dr. Lewellyn completed a statement for Opportunities for Ohioans with Disabilities. (Tr. 465.) Dr. Lewellyn stated: "It is my opinion that Ms. Simon is permanently disable[d] and cannot work at any occupation." (*Id.*)

On February 2, 2021, Dr. Lewellyn completed a narrative letter for Opportunities for Ohioans with Disabilities. (Tr. 464.) Dr. Lewellyn reported that Ms. Kraynack-Simon had seen him biweekly since May 2010, and she has been diagnosed with PTSD, generalized anxiety disorder, and bipolar II disorder. (*Id.*) Dr. Lewellyn stated that Ms. Kraynack-Simon's comorbid health conditions of Graves' disease and essential thrombocythemia "greatly impact both her physical and psychological functioning daily." (*Id.*) Dr. Lewellyn wrote that Ms. Kraynack-Simon's worsening conditions resulted in her inability to work in her prior "demanding occupation," and that her activities of daily living had been "greatly impaired." (*Id.*) Dr. Lewellyn noted that Ms. Kraynack-Simon required help in basic cleaning and meal preparation and "rarely" goes out except to pick up groceries. (*Id.*) Dr. Lewellyn also stated that "[t]he impact of COVID

7

restrictions has greatly exacerbated isolation and depressive symptoms." (*Id.*) Dr. Lewellyn described symptoms of fatigue stemming from Ms. Kraynack-Simon's physical and mental impairments, such as poor memory; poor concentration; poor focus; inability to follow through with basic instructions; and persistent depressed mood and affect. (*Id.*) Dr. Lewellyn also stated that Ms. Kraynack-Simon can "quickly become emotionally labile with either tears or irritability." (*Id.*) Dr. Lewellyn indicated that Ms. Kraynack-Simon's bipolar II disorder can also result in hypomania and insomnia with purposeless activity. (*Id.*)

On September 24, 2021, Dr. Lewellyn completed a third statement. (Tr. 664.) Dr. Lewellyn wrote that Ms. Kraynack-Simon "remains symptomatic" with depression, with depressed mood and affect; loss of self-esteem; "severely impaired" focus and concentration; and periods of labile moods and anhedonia. (*Id.*) Dr. Lewellyn also indicated that Ms. Kraynack-Simon continues to experience "chronic" PTSD symptoms of exaggerated startle response, flashbacks of abuse while awake; nightmares; and avoidance of opposite sex relationships. (*Id.*) Dr. Lewellyn noted that Ms. Kraynack-Simon has generalized anxiety symptoms of persistent worry and racing thoughts "focused on her future and inability to work and support herself." (*Id.*) Dr. Lewellyn stated that Ms. Kraynack-Simon's depression and anxiety are worsened due to increased pain from a prior ankle/foot injury. (*Id.*) Dr. Lewellyn wrote that Ms. Kraynack-Simon's bipolar disorder symptoms manifest in depression and anxiety "with few hypomanic symptoms." (*Id.*) Dr. Lewellyn concluded that Ms. Kraynack-Simon is "severely impaired from her psychological conditions and cannot be gainfully employed. The addition of her physical conditions coupled with the fatigue of the essential thrombocytosis and uncertainty of its course is a further complicating factor in her functioning." (*Id.*)

### D.  **Relevant Medical Evidence**

Ms. Kraynack-Simon saw Dr. Lewellyn from February 12, 2020, to September 10, 2021. (Tr. 665-677, 746-58.) The treatment records document mental status examinations yielding evidence of mood and affect abnormalities, such as a labile affect and a depressed, anxious, anhedonic mood. (*Id.*) Mental status examinations generally revealed that Ms. Kraynack-Simon was not unkempt or disheveled; her hygiene was not poor; there was no confusion, short-term memory loss, remote memory loss, or other cognitive abnormalities; and she was fully oriented. (*Id.*)

Ms. Kraynack-Simon began receiving care for her mental impairments through the Comprehensive Psychiatry Group prior to the alleged onset date of disability. (*See* Tr. 615, 617.) At that time, she was prescribed Xanax and escitalopram. (*Id.*) At a June 8, 2020, appointment, Ms. Kraynack-Simon reported that she lost her job, but that she had been cleaning rooms, landscaping, and "going out some." (Tr. 612.) Regarding her moods, she reported, "'I'm good' regarding moods." (*Id.*)  A mental status examination revealed Ms. Kraynack-Simon had normal speech, coherent and logical thought, stable appetite, and normal sleep. (*Id.*) She was also alert, oriented, and attentive. (*Id.*)

On September 3, 2020, Ms. Kraynack-Simon reported that her "moods have been ok" and that her symptoms were "stable." (Tr. 610.) She reported she had a "big garden" and "would like to get a job." (*Id.*) Her mental status examination results remained the same. (*Id.*) But at her December 3, 2020, appointment, Ms. Kraynack-Simon reported that "everything is terrible." (Tr. 608.) She stated that her medications "are ok to help with moods" and her moods were "generally stable." (*Id.*) She reported waking up frequently in the morning with anxiety, and that the anxiety is sometimes worse at night. (*Id.*) Her mental status examination was normal. (*Id.*)

9

Ms. Kraynack-Simon reported at a March 2, 2021, appointment that she was "fine," but also stated "it[']s a struggle daily." (Tr. 606.) Her symptoms of anxiety and depression were described as "stable." (*Id.*) Her mental status examination was normal. (*Id.*) On June 1, 2021, Ms. Kraynack-Simon stated that she was "hanging in there." (Tr. 604.) Her symptoms of anxiety and depression were "stable." (*Id.*) She reported that taking Lexapro and Xanax "helps." (*Id.*) She also reported "working on [her] garden." (*Id.*) Her mental status examination was normal. (*Id.*)

At an August 26, 2021, appointment, Ms. Kraynack-Simon described her moods as "I'm here" and "doing my best." (Tr. 742.) She reported that she was helping a friend who is a quadriplegic and "mom [who] has dementia." (*Id.*) Ms. Kraynack-Simon's symptoms of anxiety and depression were described as "stable." (*Id.*) Her mental status examination was normal. (*Id.*) On November 23, 2021, Ms. Kraynack-Simon's anxiety and depression was described by Dr. Pradeep Mathur as "stable." (Tr. 740.) Her mental status examination was normal. (*Id.*)

On February 22, 2022, Ms. Kraynack-Simon reported worsening panic attacks and described her symptoms of anxiety and depression as "not stable," after her physical impairments temporarily worsened. (Tr. 738-739.) Upon examination, she was anxious, but all other findings were normal. (Tr. 738.) She returned to care on May 17, 2022. (Tr. 736.) Her symptoms of anxiety and depression were described as "steady," and her mental status examination returned to normal. (*Id.*)

## IV.  THE ALJ'S DECISION

The ALJ first determined in her September 2022 decision that Ms. Kraynack-Simon meets the insured status requirements of the Social Security Act through December 31, 2025. (Tr. 31.) The ALJ then determined that Ms. Kraynack-Simon has not engaged in substantial gainful activity since March 29, 2020, the alleged disability onset date. (*Id.*) The ALJ next determined that Ms.

Kraynack-Simon has the following severe impairments: obesity, essential thrombocytosis, left foot arthrosis – status post fracture, rupture of the left tibialis posterior tendon, shoulder bursitis, and chronic obstructive pulmonary disease ("COPD"). (Tr. 31-33.) However, the ALJ found that none of these impairments—individually or in combination—met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 33.)

The ALJ also determined that Ms. Kraynack-Simon has the residual functional capacity to perform work at the light exertional level, except she can occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; should avoid exposure to dangerous moving machinery and unprotected heights; and should avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation. (Tr. 33-36.) The ALJ further determined that Ms. Kraynack-Simon is capable of performing her past relevant work as an advertising manager. (Tr. 37.) The ALJ stated that this work does not require the performance of work-related activities precluded by her residual functional capacity. (*Id.*) Accordingly, the ALJ concluded that Ms. Kraynack-Simon was not disabled as defined in the Social Security Act from the alleged disability onset date through the date of the ALJ's decision. (*Id.*)

## V.     LAW AND ANALYSIS

### A.     <u>**Standard of Review**</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v.*

*Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

B. **Standard for Disability**

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id*.

C. **Substantial evidence does not support the ALJ's RFC determination because the ALJ failed to properly evaluate Ms. Kraynack-Simon's mental impairments and the medical opinions related to those impairments.**

Ms. Kraynack-Simon contends that the ALJ erred by failing to consider her mental impairments when determining the residual functional capacity. Specifically, while Ms. Kraynack-Simon acknowledges that the ALJ determined at Step Two that she had mild mental limitations, Ms. Kraynack-Simon argues that this Step Two analysis was "minimal," and that the ALJ failed to consider her mental limitations at later steps in the sequential evaluation process. (ECF No. 7, PageID#944-47.) Additionally, Ms. Kraynack-Simon argues that substantial evidence does not

13

support the RFC determination because the ALJ improperly evaluated the opinion evidence. (*Id.* at PageID#948-51.) I disagree that the ALJ did not consider Ms. Kraynack-Simon's mental limitations at later steps in the sequential evaluation process. I agree, however, that the ALJ failed to properly evaluate the opinion evidence.

First, an ALJ is not required to include mental limitations in a plaintiff's RFC solely because the ALJ found mild limitations in the Paragraph B criteria for Step Two. *See Ceol v. Berryhill*, No. 3:15-CV-315-CCS, 2017 WL 1194472, at *10 (E.D. Tenn. Mar. 30, 2017) ("Therefore, a finding by the ALJ that the Plaintiff had mild limitations in the areas of daily living activities, social functioning, and concentration, persistence, or pace, does not necessarily mean that Plaintiff will have corresponding limitations with regard to her RFC."); *Phillips v. Comm'r of Soc. Sec.*, No. 3:22-cv-01144, 2023 WL 5602726, at *3 (N.D. Ohio Aug. 30, 2023) ("Mild limitations do not automatically mandate specific limitations in the RFC."); *see also Zingale v. Kijakazi*, No. 1:20-cv-2197, 2022 WL 824148, at *12 (N.D. Ohio Mar. 18, 2022) (collecting cases). Thus, the ALJ did not err in this respect.

The question before this Court, however, is whether substantial evidence supports the ALJ's determination not to include mental limitations in the plaintiff's RFC. *See, e.g.*, *Shinlever v. Berryhill*, No. 3:15-CV-371-CCS, 2017 WL 2937607, at *4-6 (E.D. Tenn. July 10, 2017). "Courts … have also found, however, that an ALJ's failure to explain how a claimant's mild psychological limitations affect the RFC assessment may constitute reversible error where the ALJ makes no mention of the claimant's mental impairments in the RFC analysis." *Shamsud-Din v. Comm'r of Soc. Sec.*, No. 16-cv-11818, 2017 WL 3574694, at *6 (E.D. Mich. July 24, 2017) (internal citations omitted).

14

The RFC is the most an individual can do despite her limitations. 20 C.F.R. § 416.945(a)(1). When determining a claimant's RFC and the corresponding hypothetical, the ALJ need only include those limitations found the be "credible" and supported by the record. *See Casey v. Sec'y of Health and Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). The RFC determination is expressly reserved for the Commissioner, not medical experts. 20 C.F.R. § 404.1546. However, "the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision." *Fleischer v. Astrue*, 77 F. Supp. 2d 875, 881 (N.D. Ohio 2011). Significantly, Social Security Ruling ("SSR") 96-8p establishes that "[i]n assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996); *see Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2).

Therefore, "[i]f the ALJ discusses an impairment in the [S]tep [T]wo severity analysis, and finds the impairment to be nonsevere, he or she must still consider the impact of any non-severe limitation in the RFC analysis." *Hines v. Berryhill*, No. 6:17-CV-160-HAI, 2018 WL 2164873, at *4 (E.D. Ky. May 10, 2018); *see Patterson v. Colvin*, No. 5:14-CV-1470, 2015 WL 5560121, at *2 (N.D. Ohio Sept. 21, 2015) ("Even when there is substantial evidence, however, a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Katona v. Comm'r of Soc. Sec.*, No. 14-CV-10417, 2015 WL 871617, at *7 (E.D. Mich. Feb. 27, 2015) ('The ALJ's analysis of Plaintiff's mental impairments at Step Two, while otherwise thorough, does not provide the Court with a basis to infer that Plaintiff's mental impairments, either singly or in combination with Plaintiff's other impairments, generated no

15

work-place restrictions or limitations.") (internal citation omitted); *see also Doll v. Saul*, No. 1:18-CV-1591, 2019 WL 3976295, at *7 (N.D. Ohio June 28, 2019) ("Even though the ALJ stated in step two that Plaintiff's affective disorder 'has no effect on her ability to perform work-related activity on a regular and continuing basis,' the ALJ was still required to discuss the combination of all her 'severe' and 'non-severe' impairments in his RFC analysis."), *report and recommendation adopted*, 2019 WL 3874354 (N.D. Ohio Aug. 22, 2019).

Here, the ALJ's decision reflects a consideration of Ms. Kraynack-Simon's nonsevere mental impairments. In particular, the ALJ discussed Ms. Kraynack-Simon's allegations regarding her mental health impairments, such as her "history of suicidal thoughts" and "frequent crying spells." (Tr. 34.) The ALJ then evaluated the relevant medical opinion evidence and credited the state agency findings of Dr. Tischler and Dr. Zeune, who determined Ms. Kraynack-Simon's mental impairments were non-severe and assessed no mental impairment-related limitations. (Tr. 36; *see* Tr. 86, 94.) The ALJ also discussed the medical opinions from Drs. Lewellyn and Gruenfeld regarding Ms. Kraynack-Simon's mental limitations and compared those opinions to the evidence overall, including Dr. Lewellyn's treatment records, Dr. Gruenfeld's consultative examination report, and the treatment records from the Comprehensive Psychiatry Group. (Tr. 36; *see* Tr. 488-94, 604-27, 744-59.) Thus, the record reflects that the ALJ considered Ms. Kraynack-Simon's mental impairments and related symptoms in assessing the RFC.

But although the ALJ considered Ms. Kraynack-Simon's mental impairments and related symptoms in assessing the RFC, the ALJ did not add any limitations to the RFC specifically relating to these impairments. Thus, as stated above, the pertinent question is "whether the ALJ's decision not to find any limitations arising from the condition[s] in question is supported by substantial evidence." *McCormick v. Comm'r of Soc. Sec.*, Case No. 5:20-CV-02510, 2022 WL

465433, at *18 (N.D. Ohio Jan. 27, 2022) (citations omitted), *report and recommendation adopted*, 2022 WL 462936 (N.D. Ohio Feb. 15, 2022). Ms. Kraynack-Simon contends that substantial evidence does not support the RFC determination because the ALJ improperly evaluated the opinions of Dr. Lewellyn and Dr. Gruenfeld. (ECF No. 7, PageID#948-51.) Specifically, she argues that: (1) the ALJ did not discuss the consistency of the opinions; (2) contrary to the ALJ's observation that the evidence showed a positive response to treatment, Dr. Lewellyn explained that Ms. Kraynack-Simon's condition had deteriorated; and (3) the ALJ erroneously discounted the opinions of Dr. Lewellyn and Dr. Gruenfeld because they were based upon subjective complaints. (*Id.* at PageID#950-51.) Ms. Kraynack-Simon's arguments are well-taken for the following reasons.

At Step Four of the sequential evaluation, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how she considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2). According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard. *See* 20 C.F.R. § 404.1520(c)(1)-(2).

The ALJ provided the following analysis of the opinions of Drs. Lewellyn and Gruenfeld:

> I find the opinions of Dr. Lewellyn and the psychological consultative examination of Dr. Gruenfeld unpersuasive. Dr. Gruenfeld concluded that stress would affect the consistency and quality of the claimant's future job tasks, she would struggle to work with others if her PTSD symptoms were triggered, and she would also experience limitations in maintaining attention and concentration and understanding, remembering and carrying out job tasks (Exhibit 10F). Dr. Lewellyn concluded that the claimant has mental health impairments such as severe impairment in her ability to relate to others, her concentration and ability to follow through with basic instructions is severely impaired, and she becomes emotionally labile easily (Exhibit 7F). These opinions are inconsistent with the medical record as a whole, including the claimant's positive response to her counseling sessions at psychotropic medications, without evidence of psychiatric hospitalization in the record, and her mostly unremarkable reported symptoms to providers and Dr. Gruenfeld, without evidence of hallucinations, delusions, obsessions, compulsions, cognitive disorder, current suicidal/homicidal ideation, or other serious issues (Exhibit 10F; 14F; 20F). Moreover, these opinions were largely based on the claimant's self-report/allegations, which are not fully consistent with the record for the reasons listed above.

(Tr. 36.)

The ALJ's explanation here does not comply with the regulations. Regarding the supportability prong, the ALJ's conclusion that the opinions of Dr. Lewellyn and Dr. Gruenfeld are unpersuasive because they were "largely based" on Ms. Kraynack-Simon's self-reported allegations was an inappropriate rationale to discount the opinion's supportability. In the context of mental impairments, a plaintiff's subjective statements are an appropriate basis for a doctor's opinion on functional abilities. *See Blankenship v. Bowen*, 874 F.3d 1116, 1123 (6th Cir. 1989) (citing 20 C.F.R. § 404.1529). Indeed, "[t]he suggestion that a trained mental health clinician's opinions can be rejected merely because they are based upon clinical observations (including the analysis of subjectively reported symptoms) has been rejected by the Sixth Circuit." *Jearame B. v. Comm'r of Soc. Sec.*, No. 1:21-cv-228, 2022 WL 3154131, at *5 (S.D. Ohio Aug. 8, 2022) (citing *Blankenship*, 874 F.2d at 1121); *see also Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 526 (6th Cir. 2014) ("Even if [the doctor] had based his medical opinion solely on Plaintiff's own reports of hallucinations, nightmares, flashbacks, isolation, and psychological numbness, that

18

likely would not have provided sufficient basis for the ALJ's rejection of his medical opinion."); *Todd v. Comm'r of Soc. Sec.*, No. 3:20-cv-1374, 2021 WL 2535580, at *8 (N.D. Ohio June 3, 2021), *report and recommendation adopted*,  2021 WL 2530846 (N.D. Ohio June 21, 2021) ("[A] critique that rejects the opinion of a psychological source because it relied on a patient's report of symptoms … would be an improper basis upon which to discount the opinion.").

The ALJ's analysis for the consistency factor also does not comply with the regulations. The regulations dictate that an ALJ must explain *how* she considered both the factors of supportability and consistency. *See* 20 C.F.R. §§ 416.920c(b) (2)-(3). As reproduced above, the ALJ explained that the opinions were inconsistent "with the medical record as a whole, including the claimant's positive response to her counseling sessions at psychotropic medications, without evidence of psychiatric hospitalization in the record, and her mostly unremarkable reported symptoms to providers and Dr. Gruenfeld, without evidence of hallucinations, delusions, obsessions, compulsions, cognitive disorder, current suicidal/homicidal ideation, or other serious issues." (Tr. 36.)

While the ALJ provided some explanation,  this explanation does not provide a clear path of reasoning as to why this evidence is inconsistent with the stated limitations from the medical opinions. For example, the ALJ cites Ms. Kraynack-Simon's "positive response" to her psychotropic medications at counseling sessions, but the ALJ offers no specific citation demonstrating how one could reach this conclusion. (*See id.*) The Commissioner points to Ms. Kraynack-Simon's reported activities such as managing a "big garden" (Tr. 610) and helping a friend who is quadriplegic and "mom [who] has dementia" (Tr. 742) as proof that Ms. Kraynack-Simon had a good response to treatment. Yet, the ALJ failed to offer this explanation or even a clear citation to allow the inference of this conclusion. Courts "may not accept appellate counsel's

19

*post hoc* rationalizations for agency action." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (citation omitted).  The ALJ also does not elaborate on how the other cited evidence was inconsistent with the limitations opined by Drs. Lewellyn and Gruenfeld. While the mental examination were objectively normal, the ALJ does not explain *what* normal findings contradict the opined limitations. The regulations require, at the least, the ALJ to consider and explain *how* she considered "the relevance of the supporting explanations and objective medical evidence presented by a medical source to support their opinions." 20 C.F.R. § 404.1520c(c)(1).

The Commissioner argues that, reading the decision as a whole, the ALJ "made multiple other findings to buttress" the opinion evaluation. A court may read the decision as a whole and with common sense to find support for the ALJ's findings. *See Buckhannon v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) ("[W]e read the ALJ's decision as a whole and with common sense.") For example, the Commissioner notes that the ALJ "evaluated Plaintiff's symptoms overall, including symptoms attributable to her mental impairments, but determined that Plaintiff's subjective complaints were not fully supported by or consistent with the evidence." (Tr. 34-35.)

But reading the decision as a whole and with common sense here leads to the conclusion that the ALJ's decision is not supported by substantial evidence. In fact, the ALJ's assessment of symptoms and discussion of the medical evidence appears to be contained to that related to Ms. Kraynack-Simon's obesity, essential thrombocytosis, left foot arthrosis – status post fracture, rupture of the left tibialis posterior tendon, shoulder bursitis, and COPD. (Tr. 34-35.) The ALJ discounted the allegations involving Ms. Kraynack-Simon's physical impairments on the basis that the diagnostic test results and physical examination findings have been largely unremarkable and she had a "mostly limited and conservative" treatment history for her orthopedic impairments since

20

the alleged onset date. (Tr. 35.) Although the ALJ concluded that Ms. Kraynack-Simon's allegations were "less than fully consistent with the evidence" (Tr. 35), the decision does not reflect how she determined that Ms. Kraynack-Simon's allegations regarding her *mental limitations* were less than fully consistent with the evidence.

The Commissioner also directs this Court to the ALJ's Step Two findings that Ms. Kraynack-Simon had mild mental limitations, arguing that such limitations are "incompatible" with the opinions of Drs. Llewellyn and Gruenfeld. But an ALJ's Step Two findings for Paragraph B and Paragraph C criteria are not an RFC assessment. SSR 96-8p, 1996 WL 374184, at *4. A claimant's RFC is formulated at Steps Four and Five, "which requires a more detailed assessment by itemizing the various functions contained in the broad categories found in paragraphs B and C." *Id.*

The Commissioner's reliance on the state agency findings also does not lend further support for the ALJ's analysis. It is the ALJ, not the state agency psychologists, who is ultimately tasked with making a disability determination based on the record as a whole. *See Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010) ("The Social Security Act instructs that the ALJ—not a physician—ultimately determines a claimant's RFC."); *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) ("[T]he ALJ is charged with the responsibility of evaluating the medical evidence and the claimant's testimony to form an assessment of [the claimant's] residual functional capacity.").

As set forth above, the ALJ failed to comply with the regulations. Without an explanation of sufficient particularity from the ALJ, judicial review of whether there is substantial evidence supporting the ALJ's determination in this respect is not possible. *See Lester v. Saul*, No. 5:20-CV-012364, 2020 WL 8093313, at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation*

*adopted sub nom. Lester v. Comm'r of Soc. Sec.*, 2021 WL 119287 (N.D. Ohio Jan. 13, 2021) ("Although the new standards are less stringent in their requirement for the treatment of medical opinions, they still require that the ALJ provide a coherent explanation of his reasoning."). Accordingly, I recommend that this case be remanded to allow the ALJ to adequately consider Ms. Kraynack-Simon's mental impairments and address the persuasiveness of Dr. Lewellyn's and Dr. Gruenfeld's opinions.

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court VACATE and REMAND the Commissioner's final decision.

Dated: March 8, 2024                                      */s Jennifer Dowdell Armstrong*
                                                         Jennifer Dowdell Armstrong
                                                         U.S. Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).